National Union Fire versus BMC Stockholders. Thank goodness, good to see you gentlemen here. Good morning, and happy holidays. How can you say that?  I'm Alan Wolf of Anderson Kill, arguing on behalf of Appellant, the policyholder, BMC. There are two questions. Ray? At the outset, maybe you can help me a little. This is kind of an unusual insurance policy from those of us who once had automobiles and things like that. Yes, sir. Maybe you can explain a little bit how it works, because I gather it's the person who's It's the insurance company that has paid too much. That's a very unusual claim. Let me put it this way. My client is a subcontractor that engages with general contractors on large tract subdivisions. These were located in Southern California and the surrounding areas. In order to qualify as a bidding contractor to get under an RFP or otherwise, they need to present insurance policies that are issued by insurance companies, having AM best ratings of this and that. And while my client is essentially self-insured, if you will, because it purchases what we call a fronting policy, it obtains these policies by admitted insurers who meet the requirements for the RFP, but essentially they're very high deductible policies. So it's a $2 million policy with a $2 million deductible. And so the insurance company's role is to adjust the claims when they come in, and then to essentially calculate the amounts due. My client collateralizes in advance. That's why this payment agreement exists. It essentially is a financing or a collateralizing agreement for the amounts that the insurance company may have to expend when it makes payment, and then it bills my client to collect back, essentially. And just remind me of the type of risks we're talking about. Construction. Construction related, Your Honor. So my client is a subcontractor, does carpentry type of work. Can't complete it. Or there are injuries on the job. Or in this case, what we had in this matter, what we had were multiple, these are multiple tract subdivisions. And I used to joke that you can set your watch by the statute of limitations for when a condo association will bring its construction defects litigation claim, because these are homeowner subdivisions, and inevitably as the statute of limitation approaches, the homeowner subdivisions identify the defects they've seen around their buildings, and then they bring an action against the contractors, the developers, et cetera. So the general contractors are named as additional insurers to my client's policies. And then when the claim comes in, the general contractor seeks that coverage, and AIG, in this case it's National Union or American Home or insurance company of the State of Pennsylvania, and for simplicity, if I may, I'll refer to them as AIG. AIG receives the demand for coverage, evaluates it, and renders a coverage determination. And it is those coverage determinations that we challenge. Those are coverage determinations that are decided exclusively under the policy. But the adjustment agreement has an arbitration clause in it. So why doesn't it govern? It doesn't govern because it doesn't address coverage issues that arise under the policies. Specifically, Your Honor, there are two provisions, two portions of the arbitration clause. One says it relates to amounts due under the payment agreement. The other is various times referred to as a catchall. I don't think it's a catchall because it says any other dispute arising out of this payment agreement. So that language in those arbitration clauses self-limits. It circumscribes the scope of what's arbitrable to things that relate to the payment dispute, not the coverage determination. And that's exclusively what my client essentially beefs about these things. My client maintains that AIG, in adjusting the claims, failed to properly analyze the exceptions to coverage, the exclusions that were included in the policy that should have barred coverage, and instead extended coverage. We believe, frankly, that AIG was spending not their own money, but the other people's money, my client's money. And so they were pretty forthcoming about extending coverage when coverage was sought. Payment agreements specifically refer to the terms of the policies. Indirect reference. Yes, Your Honor. Why doesn't that pick it up into the – take it into the arbitration provision? Okay. So the only reference to policies comes out of the definition of the words, your payment obligation, okay? So the arbitration clause says if you dispute any part of your payment obligation, then you go into the definition section in a different part of the payment agreement, and your payment obligation is defined to be the amounts we determine that you owe in accordance with this agreement and the policies. So that's in accordance with the policies. That means not in contravention of the policies, so as not to contravene the policies. Why do the policies even get referenced there? Because the policies include a bolted-on large-risk rating plan endorsement. This is — Your argument is that the payments were not made in accordance with the policies. Our argument is that the coverage determinations were separable and distinct from any payment dispute because — Coverage as determined by the policies. Correct. Under the terms of the policies only. The large-risk rating plan is bolted onto these policies. It's not normally part of an insurance policy. It's what converts this policy essentially to the fronting policy, to the self-insured type policy. And it includes a lot of things in there that are necessary for arbitrators to determine the amount of payment due. For instance, a fee schedule for the claims services. If the claims adjuster has to do this, or if the examiner has to go out to the site and do that, or if certain — it has a schedule of fees, a menu of fees. So no arbitrator determining issues of payment could ever do it without looking to the policies and seeing what's the fee schedule say this amount should be. That doesn't mean that the coverage determinations, which relate to what is or is not covered under the insuring agreement or the endorsements thereto, the exclusions thereto, would suddenly become arbitrable. That sweeps everything into a very narrow and remote phrase. Look, if AIG wanted that outcome, they could have put a simple declarative sentence in their agreement that said coverage disputes, like any other dispute we cover in this agreement, will be arbitrated. They didn't do that. A simple declarative sentence would have done that. The Court has not asked any questions about the court below deciding matters of arbitrability. I don't believe there's any question as to that. There are conflicting provisions as to that, and we believe that the Court should be affirmed on that basis. I am interested in the California court versus the New York court and how this somehow wound up being partly, I guess, a declaratory judgment in one and then a motion to, I assume, action. Yes, Your Honor. We commenced our action in the Central District of California because that's where these projects are located. That's where these policies were finalized, essentially. The exchange of the agreements took place in California. And so we believe that the most appropriate form and, in fact, the coverage determinations and the contract law issues would be subject to California law as a result. On briefing and throughout this process, there's been no dispute that California law on contracts applies. We're in New York solely because under the payment agreement, after we commenced our California action, AIG brought an order, excuse me, brought an action here in New York because there's a venue provision under the payment agreement. And this just goes to the crux of the dispute, which is AIG says this is all a payment dispute. Your coverage issues are nothing but part of a payment dispute that should be arbitrated through the New York courts and sent to arbitration. And we say, no, it's not. It's a coverage dispute. It relates to what is and is not covered under the policy, and that's a matter of contract interpretation based in California where the projects were located.  You have some time for rebuttal. Thank you, Your Honor. No problem. Good morning, Judge Shin. May it please the court. Eamon Joyce on behalf of National Union and its fellow appellees. The district court was absolutely right that it's readily apparent that arbitration is required here, but I think this case is more straightforward than the district court appreciated because of the delegation clause. And unless there's an objection from Your Honors, I'd like to start with the delegation clause. I think this court ---- The allegation? I'm sorry? I mean the delegation. Delegation clause. I think it's important for this court to start there because ---- I was just trying to get the word right.  I'm sorry if I didn't articulate it. I think the court should start there because the issue is logically antecedent and that's what the FAA tells you to do. I think it's important to bring this case in line with this court's delegation clause precedents. They go back to Belle v. Sendant, which Your Honor Judge Parker wrote. They touch on Wells Fargo v. Sappington, Payne-Weber v. Beebeck. Also to bring this case in line with the New York Court of Appeals' decision in Monarch, which had the exact same provision at issue. FAA case and held the delegation clause was clear and unmistakable. And to bring it in line with the Ninth Circuit's decision in Mohammed, which involved an intersection of a venue provision and a delegation clause much murkier than this one, Your Honors. And the Ninth Circuit had no problem reconciling the two. Of course, if Your Honors think that this delegation clause is muddy and this is for courts to reconcile rather than arbitrators, we'd ask for affirmance on that ground. I want to start with the question in a delegation case. It's the way it was stated in first options. It's the way this Court stated it. Did the parties agree to submit the arbitrability question itself to arbitration? The answer here is clear. Yes, in two ways. The front end of the clause says that arbitrators should have exclusive jurisdiction over the entire matter of dispute. That's every bit as clear as in Sappington, where the language was any controversy or dispute is subject to arbitration, and this Court enforced the delegation clause. It's every bit as clear as in Payne, Weber v. Beebeck, where the clause said any and all controversies decide in arbitration. But, you know, Judge Etkin, in effect, decided arbitrability, didn't he? Correct. So in your view, could this be raised again before the arbitrator? If your honors affirm on the delegation grounds instead, yes, I think it could. I think they could press that challenge. If you affirmed on the alternative grounds, that's the way it unfolds, right? The delegation is the arbitrator decides arbitrability. I think the arbitrator will get to the same place that Judge Etkin did for the reasons that Judge Etkin said, but I think it's important for this circuit to get this right and to make clear that it's right, not just because I don't think it makes sense to be out of step with Monarch on a FAA issue having state courts come out one way, having the federal courts come out the other way, in that AIG will file these disputes in a state court in New York. If they're above the amount in controversy, they'll get removed here, and then it's outcome determinative on the delegation issue, but because it's really clear on the delegation. I'm not sure I follow. I mean, the language says, any action proceeding concerning arbitrability may be brought only in a New York court. Yes. So it was up to Judge Etkin to decide arbitrability. A proceeding concerning arbitrability, and if you look at the including clause, it doesn't say, Judge Chin, that the federal court should have jurisdiction and decide any question of arbitrability. It doesn't define a single arbitrability question. It says a proceeding concerning arbitrability, which a motion to compel is. A delegation dispute is an arbitrability dispute. It's a gateway question of arbitrability, but the proceeding itself, the motion to compel or a motion to stay arbitration, is a proceeding concerning arbitrability. When you go down to the next clause that defines the arbitrator's power, there it's very clear, and it says the arbitrators have the power to decide questions of arbitrability. All issues. Maybe you should turn to the other. Sure. May I just round out the point with Mohammed? I think the Ninth Circuit's decision in Mohammed, if you're looking for, as I said at the outset, in Mohammed the provisions, if anything, are murkier than here because it both said that Federal courts had exclusive jurisdiction to determine any question related to the contract, and it said that arbitrators had exclusive jurisdiction over arbitrability, and the Ninth Circuit easily reconciled the two. I've just given Your Honor an easier path than that. One is the proceedings concerning arbitrability, which I think is a procedural mechanism. The second is questions of arbitrability, which a court wouldn't get to with a delegation provision. On the substantive arbitrability issue, as I said at the outset, I think Judge Etkin was right to find it readily apparent that arbitration is required here. I think part of the problem in the way that appellants formulate this dispute is they're ignoring what the claim is about. This is far from a traditional coverage case in any way. Look, AIG or National Union, whatever you want to call them here, covered. There's no dispute about that coverage. Unless AIG had gone to BMC and asked for payment, there's no claim. This case isn't anywhere. It's only once AIG sends out a bill for payment that there's any controversy to litigate. And so that dispute, even under appellant's formulation, springs, excuse me, directly from the payment agreements. But it's simpler than that, I think, for reasons Your Honor touched on, Judge Chinn, in that the payment obligation provision, which appellants didn't touch at all in their opening brief, is, as Judge Etkin found it, incorporates the terms of the policies. And that's not a stray provision in terms of doing so. Whether you want to look at it through the catch-all provision or look at the contract on the whole, if you look at A18, for instance, the beginning of this contract, what has AIG agreed to do? We touch on this in page 7 of our opening brief. We've agreed to provide you insurance and services according to the policies, right there in the payment agreement, and to extend credit to you for full payment of the entire amount of your payment obligation. So you've got the two linked together at the outset. And what has BMC agreed to do in that contract? To pay us the payment obligation. So you've got the two linked hand-in-hand all the way through. You read further down on A18. Contrary to this notion that the two are somehow divorced at every turn, A18 says this agreement begins on the effective date shown on the first page. Unless otherwise agreed in writing, this agreement will also apply to any policies and schedules that we may issue. The two are joined at the hip, both in the arbitration provision itself and all throughout this contract. And so ultimately, appellants, what they need to show is not that this provision could have been clearer or that AIG could have written it better. They have to show under Moses Cone and AT&T Technologies versus Communication Workers of America that the framing in CWA, I think, is the one that's best, where the Supreme Court said arbitration should not be denied unless it may be said with positive assurance that there's no interpretation that governs the dispute. And they just can't make out that standard, Your Honor. And so we ask that this Court affirm on both grounds. Roberts.  May it please the Court. Turning initially to the delegation clause issue, we note that this second provision that authorizes the Court to decide questions of arbitrability, basically it says, any action or proceeding concerning arbitrability, not arbitration, arbitrability, which clearly connotes questions of whether something should be arbitrated, including motions to compel or to stay arbitration. So it's including. It's not an exclusive or limited list. It is a broad empowerment to the Court to make those determinations. And of significance, that was included or set forth in an addendum to the payment agreement. In other words, it came out later and changed the base terms of the payment agreement, supplementing them. The original language in the payment agreement dealing with courts, it said arbitration. So now they changed it years later to arbitrability. I don't think there's any question that there was a failure to make out the standard of first options of Chicago relating to a clear and unmistakable intent to have arbitrators decide gateway issues of arbitrability. Now, there was discussion of Moses Cone. I want to make one point, if I may, with regard to Moses Cone. I think the Court's reliance on Moses Cone below, respectfully, was a cop-out. Moses Cone should be applied only as a last resort, when the Court is left with no other ability to decide whether something should be arbitrated. It is a default rule, but you only get to that when you have no other way to decide it. And what the Court had below — what the Court below had before it was Aloha Petroleum as well as the Alticor case, as well as the UMG Recordings case, two circuit court decisions and a district decision. And those decisions lay out a very clear roadmap of how coverage determinations, including a decision in UMG Recordings that was under California law, coverage determinations arise under the insurance policies, not the payment agreement, and are not subject to the payment agreement's provisions, and therefore are not arbitrable but may be litigated in court. Thank you. Thank you, Your Honor. We'll reserve decisions. Mr. Wolf? Yes, sir. I just know you're with Anderson Kill, is that right? Yes, I am, sir. I just wanted to note, many years ago, John Doyle was a partner at your firm. And he recently passed, I believe, yes. In the last week, and I just wanted to mention it with personal sorrow. Thank you. Thank you very much, sir. I will take that back. I never knew the man, but I will take that back. I have many colleagues who did, obviously. Thank you, Your Honor.